Brandon Orewyler (SBN 324391)
brandon@astraea.law
**ASTRAEA COUNSEL APC**
9171 Wilshire Boulevard
Suite 500 PMB 9062
Beverly Hills, California 90210
Tel: (310) 910-1390

*Attorney for Plaintiff Tokensoft, Inc.*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TOKENSOFT, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>RENZO LABS, a foreign entity; RESTAKEX VENTURES LTD., a foreign corporation; RESTAKEX FOUNDATION, a foreign entity; JAMES POOLE, an individual; and LUCAS KOZINSKI, an individual,<br><br>Defendants. | Case No. 2:26-cv-03583<br><br>**COMPLAINT FOR MISAPPROPRIATION OF TRADE SECRETS:**<br><br>**(1) 18 U.S.C. 1836 (DEFEND TRADE SECRETS ACT);**<br>**(2) CAL. CIV. CODE § 3426 (UNIFORM TRADE SECRETS ACT)**<br><br>**DEMAND FOR JURY TRIAL** |

# I. INTRODUCTION

1. James Poole co-founded Tokensoft in 2017 and served as its Chief Technology Officer. In that role, Poole had unrestricted access to Tokensoft's most valuable assets: its proprietary source code, development methodology, internal tools, and deployment infrastructure. He signed a Proprietary Information and Inventions Agreement acknowledging that all of it belonged to Tokensoft. Even after departing his day-to-day role, Poole retained access to Tokensoft's systems to assist with an ongoing business transaction.

2. Poole used that access to steal Tokensoft's proprietary technology and build a competing blockchain protocol – Renzo Protocol. He created repositories for the competing project using his Tokensoft company email address. He managed its development through Tokensoft's infrastructure. He recruited Lucas Kozinski – a former Tokensoft employee whose offer letter identifies his position as Director of Managed Services, but who has publicly claimed the title of Chief Operating Officer – and two additional former Tokensoft engineers, each bound by confidentiality agreements, to staff the new venture. Renzo Protocol raised over $20 million in venture capital and reached $3.3 billion in total value locked on the strength of technology derived, upon information and belief, from Tokensoft's trade secrets.

3. This was not the first time. While still serving as Tokensoft's CTO, Poole had used a company machine on company time to develop an unauthorized side project – Project Siren – which he transferred to an outside entity that raised $15 million. Tokensoft's CEO warned Poole to stop. Poole did it again, at a scale orders of magnitude larger.

4. Tokensoft brings this action to recover the unjust enrichment flowing from Defendants' misappropriation, to hold each Defendant accountable for its role in the theft of Tokensoft's proprietary technology, and to establish Tokensoft's ownership of the intellectual property that Poole carried out the door and never returned.

## II. PARTIES

5. Plaintiff Tokensoft, Inc. ("Tokensoft") is a Delaware corporation that maintained its principal place of business in Beverly Hills, California. Tokensoft filed a Certificate of Dissolution with the Delaware Secretary of State on July 16, 2025. Under Section 278 of the Delaware General Corporation Law, Tokensoft continues its corporate existence for three years following dissolution for the purpose of prosecuting and defending suits. This action is brought within that statutory period.

6. Defendant James Poole ("Poole") is an individual residing in Chattanooga, Tennessee. Poole co-founded Tokensoft and served as its Chief Technology Officer from the company's founding in 2017 through his departure from day-to-day operations in approximately early 2021. Poole is also a co-founder and Chief Technology Officer of Renzo Protocol.

7. Defendant Lucas Kozinski ("Kozinski") is an individual residing in Denver, Colorado. Kozinski's offer letter from Tokensoft, a true and correct copy of which is attached hereto as Exhibit 1, identifies his position as Director of Managed Services. Despite this, Kozinski has publicly represented himself as Tokensoft's Chief Operating Officer in multiple published interviews and public profiles – including stating in one published interview that he "joined Tokensoft as the Chief Business Strategist and COO."[1] Kozinski is a co-founder of Renzo Protocol and a founding contributor to Moonwell, a decentralized lending protocol.

8. Defendant RestakeX Ventures Ltd. ("RestakeX Ventures") is, upon information and belief, a corporation organized under foreign law that serves as the primary operating entity of Renzo Protocol.

---

[1] *See, e.g.*, Exclusive Interview with Renzo Founder, AiCoin (2024), available at https://www.aicoin.com/en/article/396272 ("I joined Tokensoft as the Chief Business Strategist and COO."); *see also* What is Moonwell (WELL) and How Does it Work?, KuCoin (2024), available at https://www.kucoin.com/blog/what-is-well-and-how-does-it-work ("Before his current role, Lucas served as Tokensoft's COO.").

9. Defendant RestakeX Foundation is, upon information and belief, a foundation entity organized under the laws of Panama that holds and distributes assets related to Renzo Protocol.

10. Defendant Renzo Labs is, upon information and belief, an entity with principal offices in Denver, Colorado that serves as an operational arm of Renzo Protocol.

11. RestakeX Ventures, RestakeX Foundation, and Renzo Labs (collectively, the "Renzo Entities") operated collectively as the business known as "Renzo Protocol." Upon information and belief, the Renzo Entities share common ownership and control through their co-founders, including defendants Poole and Kozinski.

## III. JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction under 28 U.S.C. 1331 because this action arises under the Defend Trade Secrets Act, 18 U.S.C. 1836. This Court has supplemental jurisdiction over the state law claim under 28 U.S.C. 1367(a) because it arises from the same case or controversy as the federal claim.

13. Venue is proper in this District under 28 U.S.C. 1391(b)(2) because a substantial part of the events giving rise to the claims occurred here. Tokensoft maintained its principal place of business in Beverly Hills, California. Tokensoft's trade secrets were developed in this District. The misappropriation originated from the unauthorized use of systems maintained by a company headquartered in this District.

## IV. FACTUAL ALLEGATIONS

### *1. Tokensoft's Proprietary Technology*

14. Tokensoft was incorporated in Delaware in August 2017. The company developed proprietary digital asset compliance infrastructure – technology enabling the compliant issuance, distribution, and management of digital assets and tokens.

15. Over several years and at substantial cost, Tokensoft's engineering team built proprietary smart contract architecture, token distribution systems, a compliance

integration layer, deployment pipelines, internal tools, and testing frameworks. These systems represented the core of Tokensoft's business and competitive advantage.

16. Tokensoft maintained its proprietary source code in non-public software repositories accessible only to authorized personnel with a legitimate business need. Access to these repositories was controlled and monitored through the company's GitHub organization.

17. Tokensoft required all employees with access to its proprietary technology to execute Proprietary Information and Inventions Agreements ("PIIAs") imposing comprehensive confidentiality, non-disclosure, and assignment obligations.

*2. Poole's Position of Trust and the PIIA*

18. Poole served as Tokensoft's co-founder and Chief Technology Officer from the company's founding through his departure from day-to-day operations in approximately early 2021. As CTO, Poole had broad, unrestricted access to all of Tokensoft's proprietary systems, source code, and confidential business information.

19. On October 16, 2019, Poole executed a Proprietary Information and Inventions Agreement with Tokensoft (DocuSign Envelope ID: E0EBC68D-B20D-4F2C-9CB2-42C95392A851). A true and correct copy of the PIIA is attached hereto as Exhibit 2.

20. The PIIA defines "Proprietary Information" broadly to include concepts, techniques, processes, methods, systems, designs, programs, source documentation, and trade secrets. PIIA, Sec. 2.

21. Under Section 3 of the PIIA, all Proprietary Information and intellectual property rights belong to Tokensoft.

22. Section 6 of the PIIA provides for the automatic, irrevocable assignment to Tokensoft of all "Company Innovations" – any inventions, works, or discoveries conceived or developed during Poole's employment or using Tokensoft's resources. Assignment occurs upon conception, not upon disclosure or completion.

23. Under Section 5 of the PIIA, Poole identified only one Prior Innovation: his personal GitHub account at https://github.com/pooleja. All other work product created during or using Tokensoft's resources belongs to Tokensoft under Sections 3 and 6.

24. Section 10 of the PIIA requires Poole, upon termination of his relationship with Tokensoft, to return all materials containing Proprietary Information and to provide written certification of compliance.

25. Section 12 of the PIIA includes the notice required by the Defend Trade Secrets Act, 18 U.S.C. 1833(b), preserving Tokensoft's right to seek exemplary damages and attorney fees under 18 U.S.C. 1836(b)(3)(C) and (D).

26. Section 13 of the PIIA provides that Poole's confidentiality and assignment obligations survive termination of his employment.

*3. Poole's Retained System Access*

27. After transitioning from his day-to-day role as CTO, Poole retained access to Tokensoft's proprietary systems for a legitimate business purpose: ongoing work on a transaction to sell Tokensoft's software business. Tokensoft had retained Bank of America as a broker to source potential purchasers. Through that engagement, Poole and the Tokensoft team pitched the software to over a dozen prospective buyers.

28. Poole's retained access included: (a) GitHub, through his company email address james@tokensoft.io, providing access to Tokensoft's proprietary source code repositories; (b) Slack, providing access to internal communications; (c) Gmail, through james@tokensoft.io, providing access to confidential correspondence; (d) Amazon AWS, providing access to cloud infrastructure; and (e) SendGrid, providing access to email delivery systems.

29. Upon concluding his work on the Bank of America transaction, Poole did not return Tokensoft's proprietary materials. Nor did he provide the written certification of compliance required by Section 10 of the PIIA. Instead, Poole retained access to Tokensoft's systems without any remaining legitimate business purpose.

30. Poole used that unauthorized access to develop a competing blockchain protocol – Renzo Protocol – using Tokensoft's proprietary technology, infrastructure, and development resources.

*4. Project Siren – Poole's First Misappropriation*

31. The Renzo Protocol misappropriation was not the first time Poole developed a competing product using Tokensoft's resources.

32. In July 2019, while serving as Tokensoft's CTO, Poole used a company machine during company time to develop a smart contract system for covered call options on Bitcoin. On August 7, 2020, Poole documented this system as "Project Siren."

33. Mason Borda, Tokensoft's CEO, warned Poole not to use company time or resources for unauthorized projects.

34. Without authorization, Poole transferred the intellectual property he had developed on Tokensoft's time and resources to Lotus Information Ltd. Under Section 6 of the PIIA, this intellectual property was automatically assigned to Tokensoft upon conception.

35. Siren Markets – the business built on the transferred technology – raised $15 million in venture capital and achieved a peak market capitalization of $400 million. All of it was built on technology developed on Tokensoft's time, with Tokensoft's resources.

36. The pattern is the same one Poole would repeat with Renzo Protocol: develop on company systems, transfer to a new entity without authorization, and fundraise on stolen technology.

*5. The Renzo Protocol Misappropriation*

37. Beginning no later than mid-2023, Poole used Tokensoft's proprietary information, development infrastructure, and retained system access to develop a competing blockchain protocol known as Renzo Protocol – a liquid restaking protocol

built on EigenLayer, initially developed under the name "RestakeX." Poole co-founded Renzo Protocol with Kozinski and Kratik Lodha.

38. Poole created at least four Renzo Protocol software repositories using his Tokensoft company email address, james@tokensoft.io: (a) Renzo-Protocol/Contracts; (b) Renzo-Protocol/renzo-dapp; (c) Renzo-Protocol/renzo-frontend; and (d) Renzo-Protocol/ETH-Staker. Three of these repositories – renzo-dapp, renzo-frontend, and ETH-Staker – are non-public and, upon information and belief, contain proprietary code derived from Tokensoft's trade secrets.

39. Two hundred ninety-seven email records document Poole actively managing Renzo Protocol development through Tokensoft's infrastructure from at least September 26, 2023 through February 14, 2024. These records include GitHub pull request notifications, code review requests, deployment approvals, and feature development correspondence for Renzo's private repositories – all flowing through james@tokensoft.io. The overwhelming majority of this development activity – approximately 81% – was concentrated in the non-public renzo-dapp repository.

40. The provenance of the Renzo Protocol codebase confirms its origins in Poole's personal use of Tokensoft's systems. The project's own package.json file still references its original creation URL: git+https://github.com/pooleja/RestakeX.git – Poole's personal GitHub account. The earliest email log entry, dated September 26, 2023, is a repository transfer notification: "[GitHub] Repository transfer from @pooleja (pooleja/RestakeX)" – delivered to james@tokensoft.io. Poole created the project under his personal account, transferred it into the Renzo Protocol organization, and managed its development through Tokensoft's email infrastructure.

### 6. *Kozinski's Participation and Team Recruitment*

41. Kozinski, Tokensoft's self-proclaimed COO and "Chief Business Strategist", had direct access to Tokensoft's proprietary information in the course of his duties, including business strategy, client relationships, and operational methodology. Kozinski executed a Proprietary Information and Inventions Agreement

with Tokensoft (DocuSign Envelope ID: 4E1832E4) that is identical in all material respects to Poole's, imposing the same confidentiality, non-disclosure, and assignment obligations. A true and correct copy of Kozinski's PIIA is attached hereto as Exhibit 3.

42. Poole and Kozinski recruited at least two additional former Tokensoft employees to Renzo Protocol: Ron Gierlach, a developer, and Randall Leung, an engineer. Each had access to Tokensoft's proprietary information during their employment. Each executed a PIIA with Tokensoft. Neither returned proprietary materials nor certified compliance upon departure.

43. Poole thus assembled at Renzo Protocol the core of Tokensoft's technical and operational team – its former CTO, a director who publicly claimed the title of COO, and two of its engineers – all bound by PIIAs, all carrying intimate knowledge of Tokensoft's proprietary methodology, all concentrated at a single competitor.

44. Upon information and belief, no measures were implemented at Renzo Protocol to prevent the use of Tokensoft's confidential information. No ethical walls were established. No independent development protocols were adopted. No policies restricted the use of prior employer trade secrets.

*7. Renzo's Rise on Misappropriated Technology*

45. Renzo Protocol launched its mainnet beta in October 2023 – approximately four months from inception to a functioning protocol. That timeline is extraordinary for a blockchain protocol of this complexity and is explicable only by the use of pre-existing proprietary methodology and code.

46. In January 2024, Renzo Protocol raised a $3.2 million seed round at a $25 million post-money valuation, led by Maven11 Capital with participation from Figment Capital, SevenX Ventures, IOSG Ventures, OKX Ventures, and others.

47. In February 2024, Renzo Protocol received an investment from Binance Labs.

48. In June 2024, Renzo Protocol closed a $17 million Series A round led by Galaxy Ventures and Brevan Howard Digital. Total capital raised: approximately $20.2 million.

49. On April 30, 2024, Renzo Protocol launched its REZ token. At its peak in April 2024, Renzo Protocol's total value locked reached approximately $3.3 billion.

50. All of this capital was raised and all of this value was generated on the strength of technology developed, upon information and belief, using Tokensoft's misappropriated trade secrets. The Renzo Entities knew or had reason to know that the technology upon which their business was built originated from Tokensoft's proprietary systems – their co-founders, Poole and Kozinski, were Tokensoft's former CTO and self-proclaimed COO and "Chief Business Strategist", and at least four members of the Renzo team were former Tokensoft employees bound by PIIAs.

*8. Discovery and Tokensoft's Response*

51. On or about October 17, 2024, Tokensoft discovered Poole's unauthorized use of its systems for Renzo Protocol development.

52. Upon discovery, Tokensoft's CEO Mason Borda immediately preserved evidence by pulling copies of the Renzo Protocol repositories that had been created under the Tokensoft GitHub organization.

53. Tokensoft immediately revoked Poole's access to all company systems.

54. Tokensoft dissolved on July 16, 2025, in part as a consequence of the misappropriation alleged herein and the related misconduct alleged in Tokensoft, Inc. v. Poole, Case No. 2:25-cv-10588-SRM-PD (C.D. Cal.). Tokensoft brings this action during its statutory wind-up period under Section 278 of the Delaware General Corporation Law.

*9. Tokensoft's Trade Secrets*

55. Tokensoft's trade secrets include: (a) proprietary source code in non-public software repositories, including code implementing token distribution architecture, a compliance integration layer, and deployment infrastructure; (b)

proprietary development methodology – the specific methods, processes, and architectural decisions by which Tokensoft selected, combined, configured, and deployed open-source components, internal tools, and custom code into a functioning commercial protocol; (c) internal tools, testing frameworks, and deployment pipelines; and (d) business intelligence, including customer and user data, investor relationships, and strategic plans.

56. These trade secrets derive independent economic value not from individual open-source libraries or standard cryptographic primitives – which are publicly available – but from the specific, proprietary methods by which Tokensoft combined these components with non-public custom code, internal tools, and proprietary configurations into a functioning commercial protocol. The compilation – the unified process, design, and operation of these elements in combination – constitutes Tokensoft's trade secret.

57. Tokensoft took reasonable measures to protect the secrecy of its proprietary information: (a) requiring all employees with access to execute PIIAs imposing comprehensive confidentiality, non-disclosure, and assignment obligations; (b) maintaining proprietary source code in non-public repositories accessible only to authorized personnel; (c) restricting system access to those with a legitimate business need; and (d) revoking access immediately upon discovering Poole's misuse.

## FIRST CAUSE OF ACTION

## Misappropriation of Trade Secrets

## (Defend Trade Secrets Act, 18 U.S.C. 1836)

## (Against All Defendants)

58. Plaintiff incorporates each preceding and subsequent paragraph as though fully alleged herein.

59. Tokensoft's proprietary technology, as described above, constitutes trade secrets within the meaning of 18 U.S.C. 1839(3): information that derives independent economic value from not being generally known to, and not being readily

ascertainable through proper means by, another person who can obtain economic value from its disclosure or use, and that is the subject of reasonable efforts to maintain its secrecy.

60. Defendants misappropriated Tokensoft's trade secrets within the meaning of 18 U.S.C. 1839(5):

(a) Poole acquired Tokensoft's trade secrets by improper means under 18 U.S.C. 1839(6) – specifically, by exploiting retained system access that had been entrusted to him for the limited purpose of the Bank of America transaction to instead develop a competing protocol;

(b) Poole disclosed and used Tokensoft's trade secrets without authorization by developing Renzo Protocol using Tokensoft's proprietary information, methodology, and non-public code;

(c) Kozinski acquired and used Tokensoft's trade secrets knowing or having reason to know they were acquired by improper means – as a former Tokensoft employee and PIIA signatory who served alongside Poole, Kozinski knew that Poole's use of Tokensoft's systems and proprietary methodology for Renzo Protocol was unauthorized;

(d) The Renzo Entities – RestakeX Ventures, RestakeX Foundation, and Renzo Labs – acquired, used, and benefited from Tokensoft's trade secrets knowing or having reason to know they were derived from Tokensoft's proprietary technology. Poole and Kozinski co-founded and controlled the Renzo Entities; their knowledge is imputed to the entities they created.

61. Tokensoft's trade secrets relate to products and services used in, and intended for use in, interstate and foreign commerce within the meaning of 18 U.S.C. 1836(b)(1). Renzo Protocol operates on a global blockchain network across state and national borders, solicited and received investment from entities in multiple states and countries, and provides financial services to users worldwide.

62. As a direct and proximate result of Defendants' misappropriation, Tokensoft has been damaged. Tokensoft is entitled to: (a) damages for unjust enrichment, including the approximately $20.2 million raised by the Renzo Entities and the personal equity and token holdings of Poole and Kozinski in the Renzo Entities, to the extent not addressed by actual damages; (b) actual damages, including the diminished value of Tokensoft's proprietary technology; (c) in the alternative, a reasonable royalty for Defendants' unauthorized use of Tokensoft's trade secrets; and (d) injunctive relief, including a constructive trust over the proceeds of the misappropriation and an order requiring the return of all materials containing Tokensoft's proprietary information.

63. Defendants' misappropriation was willful and malicious. Poole signed the PIIA acknowledging Tokensoft's ownership of its proprietary information. Poole had previously misappropriated Tokensoft's resources through Project Siren and was warned by Borda not to do so. Poole exploited access entrusted to him for a specific and limited purpose. Poole used Tokensoft's own email address to create repositories for the competing protocol. Poole recruited PIIA-bound employees to the competing venture. The scope of the misappropriation was staggering – hundreds of development actions and tens of thousands of lines of code managed through Tokensoft's infrastructure. Tokensoft is entitled to exemplary damages not exceeding two times the amount of damages awarded under 18 U.S.C. 1836(b)(3)(C) and reasonable attorney fees under 18 U.S.C. 1836(b)(3)(D).

## SECOND CAUSE OF ACTION

## Misappropriation of Trade Secrets

## (California Uniform Trade Secrets Act, Cal. Civ. Code 3426 et seq.)

## (Against All Defendants)

64. Plaintiff incorporates each preceding and subsequent paragraph as though fully alleged herein.

65. Tokensoft's proprietary technology, as described above, constitutes trade secrets within the meaning of California Civil Code Section 3426.1(d): information, including formulas, patterns, compilations, programs, devices, methods, techniques, and processes, that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and that is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

66. Defendants misappropriated Tokensoft's trade secrets within the meaning of California Civil Code Section 3426.1(b):

(a) Poole acquired Tokensoft's trade secrets through improper means within the meaning of California Civil Code Section 3426.1(a) – specifically, by exploiting retained system access entrusted to him for the limited purpose of the Bank of America transaction to instead develop a competing protocol, in breach of his contractual obligations under the PIIA;

(b) Poole disclosed and used Tokensoft's trade secrets without express or implied consent by developing Renzo Protocol using Tokensoft's proprietary information, methodology, and non-public code;

(c) Kozinski acquired and used Tokensoft's trade secrets knowing or having reason to know that the trade secrets were acquired by improper means and derived from or through Poole, who had utilized improper means to acquire them and who owed a duty to Tokensoft to maintain their secrecy under the PIIA;

(d) The Renzo Entities acquired, used, and benefited from Tokensoft's trade secrets knowing or having reason to know that their knowledge of the trade secrets was derived from or through persons – including their co-founders Poole and Kozinski – who owed a duty to Tokensoft to maintain the secrecy of those trade secrets and limit their use.

67. As a direct and proximate result of Defendants' misappropriation, Tokensoft has been damaged. Tokensoft is entitled to damages measured by: (a) the actual loss caused by the misappropriation; and (b) the unjust enrichment caused by the misappropriation that is not taken into account in computing actual loss, including the approximately $20.2 million raised by the Renzo Entities and the personal equity and token holdings of Poole and Kozinski in the Renzo Entities. In the alternative, Tokensoft is entitled to imposition of a reasonable royalty for Defendants' unauthorized use of Tokensoft's trade secrets. Cal. Civ. Code 3426.3(a).

68. Tokensoft is entitled to injunctive relief to prevent actual or threatened misappropriation of its trade secrets. Cal. Civ. Code 3426.2(a). In exceptional circumstances, an injunction may condition future use upon payment of a reasonable royalty for no longer than the period of time for which use could have been prohibited.

69. Defendants' misappropriation was willful and malicious. The facts set forth in Paragraph 63 above, incorporated herein, demonstrate that Defendants acted with willful and malicious disregard for Tokensoft's trade secret rights. Tokensoft is entitled to exemplary damages in an amount not exceeding two times the damages awarded under California Civil Code Section 3426.3(a). Cal. Civ. Code 3426.3(c).

70. Tokensoft is further entitled to an award of reasonable attorney fees under California Civil Code Section 3426.4 based on Defendants' willful and malicious misappropriation of Tokensoft's trade secrets.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Tokensoft, Inc. prays for judgment against Defendants as follows:

1. Actual damages in an amount to be determined at trial, under both 18 U.S.C. 1836(b)(3)(B) and Cal. Civ. Code 3426.3(a);

2. Damages for unjust enrichment not addressed by the actual damages computation, per 18 U.S.C. 1836(b)(3)(B)(i)(II) and Cal. Civ. Code 3426.3(a);

3. In the alternative, a reasonable royalty for Defendants' unauthorized use of Tokensoft's trade secrets, per 18 U.S.C. 1836(b)(3)(B)(ii) and Cal. Civ. Code 3426.3(a);

4. Exemplary damages not exceeding two times the amount of damages awarded for willful and malicious misappropriation, per 18 U.S.C. 1836(b)(3)(C) and Cal. Civ. Code 3426.3(c);

5. Injunctive relief per 18 U.S.C. 1836(b)(3)(A) and Cal. Civ. Code 3426.2, including a constructive trust over the proceeds of the misappropriation and an order requiring the return of all materials containing Tokensoft's proprietary information;

6. Reasonable attorney fees per 18 U.S.C. 1836(b)(3)(D) and Cal. Civ. Code 3426.4;

7. Costs of suit;

8. Pre-judgment and post-judgment interest as allowed by law;

9. Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

DATED: April 3, 2026

**ASTRAEA COUNSEL APC**

By: */s/ Brandon Orewyler*
Brandon Orewyler
*Attorney for Plaintiff Tokensoft, Inc.*